IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARTIN GARCIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21 C 405 |
| | ) | |
| ALEJANDRO MAYORKAS, Secretary, | ) | Judge Joan H. Lefkow |
| United States Department of Homeland | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Martin Garcia, a federal air marshal who is Mexican American, brings this

lawsuit against his employer, the United States Department of Homeland Security (DHS),

alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

Garcia claims that he suffered discrimination, retaliation, and a hostile work environment in

violation of Title VII after a duty supervisor made offensive comments during a pre-mission

briefing in 2018. DHS now moves for summary judgment under Federal Rule of Civil Procedure

56 on all three of these claims.[1] For the following reasons, the motion is granted in part and

denied in part.

## BACKGROUND

When considering a motion for summary judgment, the court relies on the factual

assertions and objections thereto contained in the parties' Local Rule 56.1 submissions, and it is

entitled to strict compliance with Local Rule 56.1 procedures. *See Curtis* v. *Costco Wholesale*

---

[1] The court has federal question jurisdiction under 42 U.S.C. § 2000e-5(f)(3). Venue is proper
under 28 U.S.C. § 1391(b)(2).

*Corp.*, 807 F.3d 215, 218–19 (7th Cir. 2015); *Stevo* v. *Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011). What follows are the relevant and properly supported factual assertions, based on the undisputed facts as admitted by the parties or, if an objection to an asserted fact was raised, based on the court's review of the underlying evidence cited in support of or opposition to the fact. *See Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Thus, if a submitted fact is not included below, it is because it either was immaterial and provided no helpful context or was unsupported by the evidence.

## I. Garcia's Employment with DHS

Garcia, who is Mexican American (DSOF ¶ 8),[2] began his employment as a federal air marshal with the Federal Air Marshal Service (FAMS) in October 2010 (DSOF ¶ 4). FAMS is a component of the Transportation Security Administration (TSA), which in turn is a component agency of DHS; Alejandro Mayorkas is Secretary of DHS. (DSOF ¶¶ 2, 3.) Federal air marshals provide onboard security on certain domestic and international flights. (DSOF ¶ 5.) Garcia worked out of the Chicago Field Office (DSOF ¶ 4), and from 2017 to 2022 he was assigned to Squad 5 (DSOF ¶¶ 6, 77). Garcia's first- and second-line supervisors during this time were, respectively, Supervisory Federal Air Marshal (SFAM) Darren Gengler and Assistant Supervisory Air Marshal in Charge Freeman Jordan. (DSOF ¶¶ 6–7.)

## II. The October 27, 2018 Briefing

On October 27, 2018, Garcia attended a pre-mission briefing and equipment check meeting with three other federal air marshals. (DSOF ¶ 9.) SFAM Gene Schneider, a White man, was the assigned duty supervisor that day responsible for conducting the pre-mission inspection

---

[2] This decision cites DHS's LR 56.1(a)(2) statement of facts (dkt. 37) as "DSOF ¶ _," Garcia's LR 56.1(b)(2) response (dkt. 38 at 1–6) as "RDSOF ¶ _," Garcia's LR 56.1(b)(3) statement of additional facts (dkt. 38 at 6–12) as "PSOAF ¶ _," and DHS's LR 56.1(c)(2) response (dkt. 41) as "RPSOAF ¶ _."

and briefing. (DSOF ¶¶ 11–12.) Schneider was already in the briefing room when Garcia entered. (DSOF ¶ 13.) Schneider asked Garcia, "[W]here are you from?" to which Garcia replied, "I am from Chicago. South side, Little Village." (DSOF ¶ 14.) Schneider replied "I wouldn't have taken you for a south side guy, for a Chicago guy. You have an accent, an East LA accent." (DSOF ¶ 14.) Schneider then said that Garcia should know him "because he (Schneider) lived in LA for [six or seven] years with his girlfriend and that [Garcia's] accent sounded like a 'Hey Vato type.'" (RDSOF ¶ 15; *see also* dkt. 37-1, Def.'s Ex. 3 at 96–97; dkt. 38-1, Pl.'s Ex. 1 at 96–97.) Schneider "appeared to be mimicking a Latino accent" when he made the "Hey Vato" comment. (Dkt. 38-1, Pl.'s Ex. 7 at 3.) Garcia understood the term "Hey Vato" to have a negative connotation associated with gang membership. (DSOF ¶ 18.) "Vato" is a variation on the Spanish slang term "bato," which means "guy, buddy, or dude" and "always pertains to males." (Dkt. 38-2, Ex. 15.) "Vato" "has a different connotation, and can be seen as vulgar and offensive." (*Id.*) Schneider also told Garcia that Garcia's accent reminded him of a character who was deported in the movie *Born in East L.A.* (RDSOF ¶ 16; *see also* dkt. 37-1, Def.'s Ex. 3 at 101–02; dkt. 38–1, Pl.'s Ex. 2 at 5–6.) Throughout this conversation, Schneider said "no offense" two or three times. (DSOF ¶ 19.) The interaction made Garcia feel "[h]umiliated," "in a state of shock," "belittled," "degraded," and "embarrassed" (dkt. 38-1, Pl.'s Ex. 1 at 101–02), and it left the other federal air marshals in the briefing feeling uncomfortable (RPSOAF ¶ 9). The pre-mission briefing lasted no more than fifteen minutes, after which Garcia left for his mission. (DSOF ¶¶ 20–21.) Garcia testified in his deposition that he felt distracted on the mission as a result of the incident with Schneider. (PSOAF ¶ 10.)

### III.    Garcia's EEO Complaint and Schneider's Apology

Three days later, on October 30, 2018, Garcia made initial contact with an Equal

Employment Opportunity (EEO) Counselor to file an EEO complaint. (DSOF ¶ 24.) Garcia's

EEO complaint made allegations against Schneider and framed Garcia's claim as:

> Whether Counselee, a Federal Air Marshal (FAM) at the Chicago Field Division in
> Chicago, IL, was discriminated against and subjected to harassment based on race
> (Hispanic) and National Origin (Mexican) when On October 27, 2018, management
> made constant and persistent references to Counselee's perceived East LA
> [redacted].

(Dkt. 37-1, Ex. 6 at 1–2.)

Garcia asked the three other air marshals who were present at the October 27, 2018

meeting to write a statement regarding what they witnessed. (DSOF ¶ 25; PSOAF ¶ 11.) All

three did so, including a federal air marshal named Jason.[3] (*Id.*) Jason sealed his written

statement in an envelope with Garcia's name on it and put the envelope in Garcia's work

mailbox within three days of the incident. (DSOF ¶ 26; PSOAF ¶ 13.) Approximately one to two

weeks later, Gengler told Jason that Jason's written statement had been found by Schneider.

(Dkt. 38-1, Pl.'s Ex. 1 at 137; dkt. 38-1, Pl.'s Ex. 5 at 72; dkt. 38-1, Pl.'s Ex. 7 at 4; dkt. 38-1,

Pl.'s Ex. 9 at 58; dkt. 38-2, Pl.'s Ex. 10 at 136.) According to Gengler, he and Schneider—whom

Gengler considered a "close work friend" even though the two "don't associate a whole lot

outside of the work environment"— reported the October 27, 2018 incident up the chain of

command. (PSOAF ¶ 18; RPSOAF ¶ 18.) Assistant Supervisory Air Marshal in Charge Jordan

testified that he learned of the incident around November 12, 2018 and that an incident-tracking

report was initiated on November 14, 2018. (PSOAF ¶ 21.) TSA policy requires an incident-

---

[3] In accordance with the protective order entered in this case (dkt. 18), the court refers to federal
air marshals other than Garcia only by their first names. (*See also* DSOF ¶ 25 n.1.)

4

tracking report be filed within three calendar days of management's becoming aware of alleged harassment. (PSOAF ¶ 22.)

When Gengler and Schneider reported the incident, Schneider was instructed "not to have … any contact with [Garcia], other than contact that he would have to have inside the office, either as the duty supervisor or just walking through the office." (Dkt. 38-1, Pl.'s Ex. 5 at 11.) Subsequently, on November 18, 2018, Schneider sent Garcia a text message that stated:

> I just wanted to let you know that because of [Jason], I realized just how much of an idiot I am and just how sorry I am for saying things that were not appropriate. I truly do apologize. I ask for your forgiveness for something that was actually meant with fondness and appreciation. When I was in LA I lived with my girlfriend's family for a while and you remind me of her brother. Anyway, excuses are not worth anything, so I will just say I am sorry and hope you can forgive my foolishness.

(DSOF ¶¶ 30–31.)

## IV.   TSA Anti-Harassment Policy and Investigation

In 2018, the TSA's Anti-Harassment Program required the agency to investigate any allegations of harassment as described in the TSA Management Directive (MD) 1100.73-3 Handbook (the Handbook). (DSOF ¶¶ 32–33.) The Handbook laid out the following policies and procedures:

> The fact-finder may determine that a full fact-finding inquiry is not necessary for all reported incidents. The fact-finder will consult with the [Anti-Harassment Coordinator] to determine if a simplified inquiry (e.g., collecting statements from affected person, alleged harasser and any witnesses) is more appropriate. …

> Appropriate circumstances exist [for a simplified inquiry] when the harassing conduct alleged is not egregious and/or complex and the number of witnesses involved is low. In these instances, management will compile the necessary evidence (e.g., statements from affected persons, alleged harasser and any witnesses), adjudicate the matter in accordance with applicable TSA policy, and notify the AHC of the resolution and outcome. …

> The fact-finding described herein does not, and is not intended to supplant the investigation that will occur if the affected person initiates an EEO complaint with [the Civil Rights, Diversity and Inclusion (CRDI) Division]. Management officials

> must investigate harassment allegations regardless of whether an employee initiates an EEO complaint with CRD[I].

(DSOF ¶¶ 34–36.)

The TSA investigated the October 27, 2018 incident using the simplified inquiry process (DSOF ¶ 37), which allows the agency to adjudicate the matter based on statements collected from affected persons, the alleged harasser, and any witnesses (dkt. 37-1, Def.'s Ex. 11 at 5, 8–9). On February 4, 2019, Gengler sent Garcia an email with the subject "Statement Needed," which read:

> They want a statement from you regarding what [Schneider] said during [the October 27, 2018 briefing]. I know you said the EEO office told you not to discuss the matter further. On the statement, just write "The TSA EEO Office advised you not to make any further statements regarding this matter."

(DSOF ¶ 39.) Garcia did not provide a statement (DSOF ¶ 40; RDSOF ¶ 40), and Gengler did not ask Garcia for a statement at any other time.[4] (Dkt. 37-1 at 69.) The only other occasion when Garcia was asked to provide a statement as part of TSA's investigation occurred during a brief conversation Garcia had with SFAM Bradley Curtis in the Chicago field office's "bullpen area."[5] (DSOF ¶¶ 41–42.) Garcia and Curtis passed by each other, and Curtis asked Garcia for a

---

[4] Garcia tries to create a disputed issue of fact by arguing that "this was only one of Gengler's requests for a statement." (RDSOF ¶ 40.) In support, Garcia cites to his deposition testimony in which he affirmed that he had "previously told Mr. Gengler that [he] would not make a statement regarding this issue." (Dkt. 38-1, Pl.'s Ex. 1 at 65.) Just a few pages later in the transcript, however, Garcia confirmed that the only two occasions when TSA requested or suggested that Garcia write a statement were the Gengler email and a conversation Garcia had with SFAM Bradley Curtis. (Dkt. 37-1, Def.'s Ex. 3 at 69.) Consequently, the record shows that although Garcia told Gengler he would not write a statement at least twice, Gengler only requested a statement once—in the February 4, 2019 email.

[5] Garcia tries to suggest that he was asked for statements on other occasions. In support, he cites two documents: first, a January 30, 2019 email from Curtis to Gengler (to which Garcia is not copied) asking Gengler to have Garcia complete a statement (dkt. 38-2, Pl.'s Ex. 14); and second, a March 25, 2019 memorandum to Garcia from Curtis informing Garcia that the TSA had concluded its investigation and asking Garcia to sign the memo to acknowledge receipt. (Dkt. 38-2, Pl.'s Ex. 16). On their face, neither of these documents suggest that Garcia was asked to provide a statement on any occasion other than the Gengler email and Curtis conversation.

memorandum regarding the October 27, 2018 incident. (DSOF ¶ 42.) "Garcia told Curtis he could not provide a statement and needed to contact the EEO official handling his EEO complaint. Curtis said, 'okay' and walked away." (*Id.*)

Schneider was issued a letter of reprimand at the conclusion of the investigation, which was later reduced to a letter of counseling. (PSOAF ¶ 23; RPSOAF ¶ 23.) Schneider's November 18, 2018 text message to Garcia is the only communication between Schneider and Garcia to occur following the October 27, 2018 incident. (DSOF ¶ 30.) Garcia has not interacted with Schneider in a duty capacity since October 27, 2018, but they occasionally walk past each other in the office. (RDSOF ¶ 76; dkt. 38-1, Pl.'s Ex. 1 at 80.) Although TSA "has the discretion and the authority to separate an alleged harasser from the affected person in the workspace when the harasser has discriminatorily harassed the affected person" (PSOAF ¶ 27), TSA has not formally separated Garcia and Schneider because the two do not work with each other and have not spoken since the October 27, 2018 incident except for Schneider's November 18, 2018 text message. (PSOAF ¶ 28; RPSOAF ¶ 28.) Garcia has experienced depression with post-traumatic symptoms following the October 27, 2018 incident. (PSOAF ¶ 28; dkt. 38-2, Pl.'s Ex. 13.)

## V.  Garcia's Continued Employment with TSA

Garcia continues to fly missions operating out of the Chicago Field Office and to work out of the bullpen area of the Chicago Field Office when he is not flying missions. (DSOF ¶¶ 46, 57.) Garcia's job responsibilities have not significantly changed since October 27, 2018, although he perceives the Chicago Field Office as generally having higher expectations of its federal air marshals. (DSOF ¶ 43.) Garcia has not applied for, nor been denied, any promotions since the October 27, 2018 incident, although he requested to be transferred to a different squad in April 2022. (DSOF ¶¶ 45, 78.) He has not received any warnings, reprimands, or suspensions since January 2017. (DSOF ¶¶ 44, 54.)

All TSA employees receive an annual performance evaluation. (Dkt. 37-1, Def.'s Ex. 4 ¶ 3.) "The highest rating of record possible is Achieved Excellence; the second highest rating of record possible is Exceeded Expectations." (*Id.*) These ratings were formerly accompanied by numerical scores, but TSA discontinued this practice for Fiscal Year 2022 (the period of October 1, 2021 to September 30, 2022) onward. (*Id.*) Beginning in Fiscal Year 2022, employees only receive their rating of record with their annual performance evaluation. (*Id.*) Garcia has never received ratings of record below "Exceeded Expectations" while employed by DHS, and he earned "Achieved Excellence" ratings in his annual evaluations covering the period from October 1, 2020 to September 30, 2022. (DSOF ¶¶ 48–53; RPSOAF ¶ 2.) Garcia's 2022 performance evaluation included a recommendation to take professional development courses offered by the TSA, but he has not yet done so. (DSOF ¶¶ 55–56; RDSOF ¶ 56.)

High ratings in annual performance evaluations have some connection to pay increases. All federal air marshals get the standard pay increase common to all federal employees, but federal air marshals who score particularly well in their annual performance evaluations can receive an additional bump in compensation. (PSOAF ¶¶ 32, 38; dkt. 38-1, Pl.'s Ex. 1 at 139–40.) Evidence regarding the exact contours of the TSA's pay incentive policy—including how well a federal air marshal must be rated to receive this additional pay increase—is not in the record before the court, but Garcia understood the policy to require a score of 4.5 or greater when the TSA was still using numerical scores in its evaluations.[6] (PSOAF ¶ 32.) Although

---

[6] The only evidence before the court regarding the TSA's incentive policies comes from Garcia's deposition testimony (*see* dkt. 38-1, Pl.'s Ex. 1 at 139), but DHS objects that "Garcia's deposition testimony does not establish that he has personal knowledge of DHS's policies for awarding or receiving incentive pay increases or raises" (RPSOAF ¶ 32). This objection is sustained. Garcia can testify to his understanding of the incentive system as someone who operates within it, but he cannot testify authoritatively as to TSA's incentive policies without first providing adequate foundation. *See* Fed. R. Evid. 602.

various additional tasks like serving as a team leader on missions or mentoring new hires have no direct financial benefit (DSOF ¶¶ 58, 62, 68–69, 75, 80; dkt. 37-1, Def.'s Ex. 4 ¶¶ 4–5; dkt. 38-1, Pl.'s Ex. 1 at 134–35), fulfilling such roles can improve evaluation scores (RDSOF ¶¶ 62, 75). Serving as a team leader or mentor, therefore, can have an indirect financial benefit to the extent that such tasks can boost performance ratings, which in turn can result in a larger raise if the final performance rating is high enough.

Garcia has served as a team leader on many missions and expected to fill that role on an international mission in January 2022, but Gengler assigned the team leader task to a different federal air marshal who had recently traveled to the same foreign destination and therefore already knew the relevant procedures. (DSOF ¶¶ 59–61.) Garcia also told Gengler that he wanted to be a mentor in September 2021, but other federal air marshals with more experience on the job were chosen instead. (DSOF ¶¶ 71–74.) Garcia believes that one of the selected mentors is white and the other of Hispanic descent. (RPSOAF ¶ 36; Dkt. 38-1, Pl.'s Ex. 1 at 54–55.) Garcia also testified that Gengler told him that federal air marshals who fly internationally cannot be picked as mentors, even though Garcia went on international missions with other air marshals who were also mentors. (PSOAF ¶ 37; dkt. 38-1, Pl.'s Ex. 1 at 50.)

From October 1, 2016 to September 30, 2021 (after which TSA ceased using numerical scores in its annual performance evaluations (dkt. 37-1, Def.'s Ex. 4 ¶ 3)), Garcia received the following scores in his evaluations:

- For the period 10/01/16 – 09/30/17: 3.92.
- For the period 10/01/17 – 09/30/18: 4.37.
- For the period 10/01/18 – 09/30/19: 4.37.
- For the period 10/01/19 – 09/30/20: 4.42.
- For the period 10/01/20 – 09/30/21: 4.49.

(DSOF ¶¶ 48–52.) Garcia received a standard pay increase each year. (DSOF ¶ 47.)

Lastly, Garcia tested positive for COVID-19 in November 2020 and was required per federal policy not to fly for approximately 14 days. (DSOF ¶ 63.) Gengler incorrectly entered this in the employee tracking system as "regular" sick leave instead of "weather-safety-sick" leave, but this coding was corrected within hours at Garcia's request. (DSOF ¶¶ 64–66.) Garcia cannot recall any other time that he needed to send an email to get coding for leave corrected. (RDSOF ¶ 67.)

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant has the initial responsibility of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). If the movant carries its burden, the nonmovant must then show a genuine dispute of fact supported by "proper documentary evidence." *Weaver* v. *Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) (quoting *Beardsall* v. *CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020)). The nonmovant must do more than raise "some metaphysical doubt as to the material facts[,]" *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); rather, he "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. The court views all facts in the light most favorable to the nonmovant and draws all reasonable inferences in his favor. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587. If the nonmovant is unable to "establish the existence of an element essential to

10

his case, and on which he will bear the burden of proof at trial, summary judgment must be granted." *Lesiv* v. *Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (cleaned up).

## ANALYSIS

DHS asks the court to grant summary judgment on all claims against it. The court agrees that DHS is entitled to summary judgment on Garcia's race discrimination and retaliation claims, but it concludes that a triable issue of fact remains with regard to Garcia's hostile work environment claim.

## I. Title VII Race Discrimination

Garcia's first count seeks damages for race discrimination under Title VII. Title VII provides that "[i]t shall be an unlawful employment practice for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "To succeed on a Title VII discrimination claim, an employee must prove (1) that she is a member of a protected class, (2) that she suffered an adverse employment action, and (3) causation." *Lewis* v. *Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). A Title VII discrimination claim will survive a motion for summary judgment if the evidence "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 760 (quoting *Abrego* v. *Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018)). The burden-shifting approach articulated by the Supreme Court in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973), provides "a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases," but it is "not the only way to assess circumstantial evidence of discrimination." *Abrego*, 907 F.3d at 1012 (quoting *David* v. *Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017)).

Here, DHS contends that it is entitled to summary judgment on Garcia's race discrimination claim because Garcia has not suffered an adverse employment action. (Dkt. 36 at 5–7.) "A materially adverse employment action is one where the plaintiff suffers 'a significant change in employment status.'" *Reives* v. *Ill. State Police*, 29 F.4th 887, 894 (7th Cir. 2022) (quoting *Boss* v. *Castro*, 816 F.3d 910, 917 (7th Cir. 2016)). Such adverse employment actions "generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce further career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton* v. *Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011); *see also Reives*, 29 F.4th at 894.

Garcia argues that he suffered an adverse employment action as a result of DHS "depriving [him] of an opportunity to receive greater financial compensation" because Gengler did not score Garcia high enough in his evaluations to receive a greater than standard raise and did not allow him to increase his score by serving as a mentor. (Dkt. 39 at 7.) These experiences do not fall into any of the three relevant categories. *See Barton*, 662 F.3d at 453–54. Garcia cannot even point to *negative* performance evaluations, as the undisputed facts show that his ratings of record and evaluation scores were already high and have *improved* since 2018. (DSOF ¶¶ 50–53.) Improved scores can hardly be described as "adverse" to Garcia. *See Reives*, 29 F.4th at 894 ("[N]egative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions.") (quoting *Grube* v. *Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001)). And while Garcia may want a higher pay raise than the standard increase received by his colleagues or think he should be selected as a mentor, "an adverse

employment action does not include an employer's refusal to grant an employee a discretionary benefit to which she is not automatically entitled[.]" *Hottenroth* v. *Vill. of Slinger*, 388 F.3d 1015, 1033 (7th Cir. 2004).

Because the undisputed facts show that Garcia has not suffered an adverse employment action and Garcia has not pointed to any genuine disputes of material fact that a reasonable jury could conclude justify a verdict in his favor, DHS is entitled to summary judgment on Garcia's race discrimination claim.

## II.    Title VII Retaliation

Garcia's second count seeks damages for retaliation under Title VII. Title VII provides, "It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A plaintiff's retaliation claim will survive summary judgment if, "construing the evidence in [plaintiff]'s favor and giving her the benefit of reasonable inferences, a reasonable jury could find that (i) she engaged in activity protected under Title VII; (ii) she suffered an adverse employment action; and (iii) her protected activity and the adverse action(s) were causally connected." *Runkel* v. *City of Springfield*, 51 F.4th 736, 746 (7th Cir. 2022).

DHS argues that Garcia cannot establish the adverse action or causal connection elements of his claim. (Dkt. 36 at 7–13.) Turning first to the adverse action prong, Garcia identifies a variety of actions that he claims his managers took in retaliation for his filing the EEO complaint against Schneider: Gengler's request that Garcia give a statement about the October 27, 2018 incident, Curtis's request that Garcia give a statement about the October 27, 2018 incident, the "low scores" Gengler gave Garcia on his performance evaluations, Gengler's "denying [Garcia]

13

team leader and mentor opportunities," Gengler's allegedly lying to Garcia "about how he could become a mentor," and Gengler's entering the wrong leave code in the TSA system after Garcia was exposed to COVID. (Dkt. 39 at 8–10.) Before reaching the merits question as to whether any of these acts constitutes an adverse action, the court must first consider the issue of administrative exhaustion, as DHS argues that Garcia has not properly exhausted his administrative remedies with respect to any of the actions occurring in or after 2020 that Garcia claims are retaliatory. (Dkt. 36 at 12.) These include the events Garcia cites surrounding COVID leave and team leader and mentor selection. (*Id.* at 10–12.)

"Federal government employees may bring Title VII … employment discrimination claims in federal court only after they have timely exhausted their administrative remedies." *Formella* v. *Brennan*, 817 F.3d 503, 510 (7th Cir. 2016) (citing 42 U.S.C. § 2000e-16c). To fulfill this exhaustion requirement, a federal employee "must obtain EEO counseling or file an informal complaint within 45 days of the alleged discriminatory action." *Id.* (citing 29 C.F.R. § 1614.105(a)(1)). "[T]he scope of the complaint brought before the administrative agency limits the scope of subsequent civil proceedings in federal court[,]" and "plaintiffs may pursue only those claims that could reasonably be expected to grow out of the administrative charges." *Reynolds* v. *Tangherlini*, 737 F.3d 1093, 1099–1100 (7th Cir. 2013). A claim satisfies this requirement that it be "like or reasonably related to" the administrative charges if it, "at minimum, describe[s] the same conduct and implicate[s] the same individuals." *Hambrick* v. *Kijakazi*, 79 F.4th 835, 841 (7th Cir. 2023) (quoting *Reynolds*, 737 F.3d at 1100)).

Garcia's 2018 EEO complaint makes allegations against Schneider related to the October 27, 2018 incident. (Dkt. 37-1, Ex. 6 at 1–2.) DHS argues that the conduct cited by Garcia as occurring in 2020 and beyond deals with actions made by Gengler and involves

14

conduct entirely different from the harassment by Schneider that Garcia complained of in his EEO complaint. (Dkt. 36 at 12–13.) As a result, DHS contends that these 2020 and beyond events are not "like or reasonably related to" the charges in Garcia's EEO complaint, Garcia has not exhausted his administrative remedies with regard to those events, and the events are therefore not properly before the court. Garcia makes no response to this argument and therefore forfeits the issue. *See Nichols* v. *Mich. City Plant Planning Dept.*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."). Accordingly, the court gives no consideration to the 2020 and beyond events because any potential retaliatory conduct they display are not properly before the court.

That leaves the requests for statements and the "low" evaluation scores, but none of these events was an adverse action. A "materially adverse action is defined as an action 'that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.'" *Lesiv*, 39 F.4th at 911–12 (7th Cir. 2022) (quoting *Poullard* v. *McDonald*, 829 F.3d 844, 856 (7th Cir. 2016)). "'[T]rivial harms,' such as 'petty slights or minor annoyances that often take place at work and that all employees experience,' … do not qualify as materially adverse." *Id.* at 912 (quoting *Burlington N. and Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68, 126 (2006)). Furthermore, "[f]ederal law protects an employee only from retaliation that produces an injury." *Poullard*, 829 F.3d at 856 (quoting *Stephens* v. *Erickson*, 569 F.3d 779, 790 (7th Cir. 2009)). Ultimately, "[c]ontext is often key[,]" and "[c]ourts need to focus on whether, under the particular circumstances, a reasonable jury could find that the employer's actions would dissuade reasonable employees from asserting

15

rights under Title VII." *Lesiv*, 39 F.4th at 912–13. This standard "is easier to satisfy than the comparable standard for Title VII discrimination claims." *Id.* at 912.

With respect to the requests for statements by Gengler and Curtis, there is no evidence that these requests were anything more than "minor annoyances." *Lesiv*, 39 F.4th at 912. Gengler's February 4, 2019 email requesting a statement from Garcia reads in its entirety:

> They want a statement from you regarding what [Schneider] said during [the October 27, 2018 briefing]. I know you said the EEO office told you not to discuss the matter further. On the statement, just write "The TSA EEO Office advised you not to make any further statements regarding this matter."

(DSOF ¶ 39.) Garcia makes the conclusional claim that this email "was framed in a way that made [Garcia] feel as if he was being commanded/directed by management to write said statement and that if [Garcia] didn't comply, he would be disciplined." (Dkt. 39 at 9.) Such claim is entirely unsupported by the actual text of the email—which, instead of threatening discipline if Garcia refused to provide a statement, goes out of its way to recommend language Garcia can use in a refusal to provide a statement. Similarly, when Curtis asked Garcia for a memorandum regarding the October 27, 2018 incident, "Garcia told Curtis he could not provide a statement and needed to contact the EEO official handling his EEO complaint. Curtis said, 'okay' and walked away." (DSOF ¶ 42.) Nothing about this interaction shows even a hint of harassment or threat. Nor can the court draw an inference in Garcia's favor that Gengler and Curtis had an intent to harass or retaliate against Garcia by asking him for a statement on these two occasions because they were acting in accordance with TSA's internal anti-harassment policy by doing so. (*See* DSOF ¶¶ 34–36.) In context, none of the evidence before the court on summary judgment would allow a reasonable jury to find that Gengler and Curtis's requests for statements "would dissuade reasonable employees from asserting rights under Title VII." *Lesiv*, 39 F.4th at 913.

As for the evaluation scores, Garcia can similarly point to no evidence that Gengler "wrongfully gave [Garcia] low scores on his performance evaluations." (Dkt. 39 at 9.) The court reiterates that the undisputed facts show Garcia's ratings of record and evaluation scores were already high and have *improved* since 2018. (DSOF ¶¶ 50–53.) The only sources that Garcia cites in support of his assertion that the scores were wrongfully low are his own opinions that Gengler used an improper evaluation matrix and "never gave [Garcia] the score that he deserved." (PSOAF ¶¶ 33–34; dkt. 38-1, Pl.'s Ex. 1 at 21–29.) But Garcia freely admits that his knowledge of Gengler's evaluation methods is incomplete (dkt. 38-1, Pl.'s Ex. 1 at 22), and Garcia's deposition testimony lays no foundation to establish that he has personal knowledge of TSA's policies regarding evaluation methods or the permissibility of Gengler's methods under those policies, *see* Fed. R. Evid. 602. That makes his testimony regarding the evaluation matrix little more than speculation.

Furthermore, Garcia's opinion that he deserved higher evaluation scores—even if based on his own assessment of his performance (*see* dkt. 38-1, Pl.'s Ex. 1 at 21–29)—is not admissible evidence that he did deserve higher scores. Because Garcia had only partial knowledge of Gengler's evaluation methods (*id.* at 22), he lacks the personal knowledge needed to testify to the accuracy of the results produced by those methods, *see* Fed. R. Evid. 602. To be sure, Garcia could still create a triable issue of fact if he could point to other evidence that his evaluation scores were artificially low. Unfortunately for Garcia, none of the evidence that might permit him to do so—for example, documents or authoritative testimony regarding TSA evaluation policies, documents or authoritative testimony regarding Gengler's evaluation matrix, paperwork associated with Garcia's evaluations, testimony or paperwork regarding the evaluations of similarly-situated federal air marshals—appears to be in the summary judgment

17

record, despite its presumptive availability to Garcia during the discovery process. Once again, therefore, none of the evidence before the court on summary judgment would allow a reasonable jury to find that Gengler's evaluations of Garcia's performance "would dissuade reasonable employees from asserting rights under Title VII." *Lesiv*, 39 F.4th at 913.

Because the record shows neither undisputed evidence that Garcia suffered an adverse action nor a genuine dispute of fact regarding the same, DHS is entitled to summary judgment on Garcia's retaliation claim.[7]

## III. Title VII Hostile Work Environment

Finally, Garcia's third count seeks damages under Title VII for the creation of a hostile work environment. Title VII "forbids employers from requiring people to work in a discriminatorily hostile or abusive environment." *Boss* v. *Castro*, 816 F.3d 910, 920 (7th Cir. 2016). To survive summary judgment, a hostile work environment plaintiff must present evidence demonstrating "(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Id.* The "severe or pervasive" prong requires a showing that the alleged conduct be "sufficiently severe or pervasive to alter the conditions of employment." *Johnson* v. *Advocate Health and Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (quoting *Scruggs* v. *Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009)). In determining whether a plaintiff has made such a showing, courts must consider the totality of circumstances, including "the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive

---

[7] As the court finds no adverse action, it need not consider the parties' arguments regarding the causation element of Garcia's claim.

18

utterance), and whether it unreasonably interferes with the employee's work performance." *Abrego* v. *Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (internal quotation marks omitted).

This standard requires a plaintiff to show either that the conduct is severe *or* pervasive; "the standard may be met by a single extremely serious act of harassment or by a series of less severe acts." *Robinson* v. *Perales*, 894 F.3d 818, 828 (7th Cir. 2018). That said, "[o]ffhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Johnson*, 892 F.3d at 900 (quoting *Passananti* v. *Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012)). Within this spectrum, the "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII[.]" *Cerros* v. *Steel Techs., Inc.*, 398 F.3d 944, 951 (7th Cir. 2005) (quoting *Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (brackets omitted). However, "while there is no 'magic number' of slurs that indicate a hostile work environment, we have recognized before that an unambiguously racial epithet falls on the 'more severe' end of the spectrum." *Id.* (cleaned up). Because determining "[w]hether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury[,]" the court may grant a defendant's motion for summary judgment only if it concludes "that no reasonable jury could find the conduct at issue severe or pervasive." *Johnson*, 892 F.3d at 901.

The parties' briefs focus on the key issue of whether Schneider's remarks at the October 27, 2018 briefing constituted harassing conduct that was "sufficiently severe or pervasive to alter the conditions" of Garcia's employment. *See Johnson*, 892 F.3d at 900. Schneider told Garcia that he has "an East LA accent," that Garcia should know Schneider "because he (Schneider) lived in LA for [six or seven] years with his girlfriend and that

19

[Garcia's] accent sounded like a 'Hey Vato type[,]'" and that Garcia's accent reminded him of a character who was deported in the movie *Born in East L.A.* (DSOF ¶ 14; RDSOF ¶ 15, 16; dkt. 37-1, Def.'s Ex. 3 at 96–97, 101–02; dkt. 38–1, Pl.'s Ex. 2 at 5–6; *see also* dkt. 39 at 11.) Schneider also appeared to mimic a Latino accent when making the "Hey Vato" comment. (Dkt. 38-1, Pl.'s Ex. 7 at 3.)

Schneider's remarks were clearly inappropriate, unprofessional, and racially motivated. They deeply hurt and offended Garcia, and they made the other federal air marshals in the briefing feel uncomfortable. (PSOAF ¶¶ 10, 28; RPSOAF ¶ 9; dkt. 38-1, Pl.'s Ex. 1 at 101–02; dkt. 38-2, Pl.'s Ex. 13.) Even so, had they been made by a co-worker, this single incident would likely be too isolated to allow a hostile work environment claim to survive summary judgment. *See Nichols*, 755 F.3d at 601 ("one utterance of the n-word has not generally been held to be severe enough to rise to the level of establishing liability."). But Schneider made these offensive remarks in a briefing he was giving in a supervisory capacity (even if he was not Garcia's direct supervisor), and he made the remarks to Garcia's face in front of Garcia's colleagues. (DSOF ¶¶ 9–12.) The Seventh Circuit has "repeatedly treated a supervisor's use of racially toxic language in the workplace as much more serious than a co-worker's," and "when the harassment involves such appalling racist language in comments made directly to employees by their supervisors, we have not affirmed summary judgment for employers." *Gates* v. *Bd. of Ed. of the City of Chi.*, 916 F.3d 631, 638–39 (7th Cir. 2019) (collecting cases); *see also Robinson*, 894 F.3d at 829–30 ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment, than the use of an unambiguously racial epithet such as 'n- - - -r' by a supervisor in the presence of his subordinates. … Indeed, [the defendant] used this slur not just in the presence of a subordinate … but directed the epithet at the subordinate

himself."). In light of this precedent, the court cannot conclude that no reasonable jury could find the conduct severe, although not pervasive.

Put differently, the government's argument essentially asks the court to make a judgment call about the objective severity of Schneider's language. Is calling Garcia a "Hey Vato type" while mimicking a Latino accent, then comparing him to a movie character who was deported, as severe as a supervisor who uses the n-word in front of an African-American employee? *See Gates*, 916 F.3d at 639–41; *Robinson*, 894 F.3d at 828–30; *Cerros*, 398 F.3d at 950–51. Maybe, maybe not. Making such a judgment call fundamentally belongs to the jury. DHS's motion for summary judgment on Garcia's hostile work environment claim is therefore denied.[8]

## CONCLUSION AND ORDER

For the foregoing reasons, DHS's motion for summary judgment is granted with respect to Garcia's Title VII race discrimination and retaliation claims and denied with respect to Garcia's hostile work environment claim. This case will be called for status on October 25, 2023 at 9:30 a.m. The parties shall engage in a sincere effort to resolve the remaining issue and be prepared to report on their progress at the status hearing.

Date: September 29, 2023

U.S. District Judge Joan H. Lefkow

---

[8] Garcia also advances arguments in support of his hostile work environment claim that DHS retaliated against him and that the distraction Garcia felt on his mission immediately following the October 27, 2018 incident "posed a physical threat to [Garcia], the other [federal air marshals] and passengers on the flight as they were on an international mission together where they provide international security." (Dkt. 39 at 13–14.) These arguments should not return at trial. The court explained at length above why summary judgment for DHS is appropriate on Garcia's retaliation claim. As for the "physical threat" argument, Garcia cites to no evidence that anyone's life or safety was in danger on that mission, much less that the risk increased due to his distraction. The court will not permit Garcia to use the trial on his hostile work environment claim to bring in arguments about the requests for statements, performance evaluation scores, team leader and mentorship opportunities, and COVID leave coding on which the court granted DHS summary judgment, nor will it allow any party to make speculative assertions of danger that could prejudice the jury.